**Mildred Hazel WHITEHOUSE, as Ancillary Administratrix of the Estate of Alfred E. Whitehouse, deceased, Plaintiff,**

v.

**Melvin PINE, Defendant.**

**Civ. A. No. 14026.**

United States District Court
E. D. New York.

July 15, 1958.

Engel, Judge, Miller, Sterling & Reddy, New York City, for plaintiff, by John F. Reddy, Jr. and William M. Kaplan, New York City, of counsel.

Leo Brown, New York City, for defendant.

BYERS, Chief Judge.

This controversy in which the plaintiff seeks an accounting from the defendant, has to do with his stewardship concerning his handling of a reserve fund originally stated at $50,000, which existed on the books of a partnership of which the defendant and Alfred E. Whitehouse (who died in February of 1946) were the members; it terminated on May 31, 1944, as its terms recite.

The defendant was the general partner and the said Whitehouse a special partner.

The partnership agreement constitutes Exhibit B attached to the complaint, and the portion which is material to this controversy is found in Subdivision VI–A–3:

"The establishment of a reserve fund in the sum of $50,000, of which 'Whitehouse' and 'Pine' shall each have a one-half interest, to be established specifically for the purpose of meeting any contingent claims which may arise from or through the dissolution of the corporation known as Whitehouse & Pine, Inc. Upon dissolution, termination or expiration of the partnership, the balance in this fund herein established shall be

divided equally between 'Whitehouse' and 'Pine'."

The partnership purpose was to effectuate the distribution of the corporate assets of the said corporation, of which these partners had been equal owners of the entire capital stock.

The corporate business was to act as commission broker in the foreign and domestic sale of products manufactured by others. The corporation was organized January 1, 1940, and its earnings were commissions on sales of the said products which averaged 10%; the company prospered for about two years, at the end of which time dissolution was decided upon as the result of differences of opinion between Whitehouse and Pine.

It is of importance that the corporation assets then consisted almost entirely of commissions receivable arising from sales made during the said two years. There was no tangible property, such as plant or merchandise inventory, and the evidence that there was such a thing as corporate capital, was found in books and records.

The distribution of the corporate assets obviously meant the collection of commissions receivable, and such distribution was to be contrived through the operations of the said partnership.

This reserve account was identified as such upon the books of the partnership. As to this, Pine has testified as follows:

"Q. But there did come a time when that fund was established?

"A. Yes. The fund was established in the books of the partnership."

The foregoing means that the reserve account was identified as such in the financial records of the partnership; it never existed in the form of, for instance, funds separately invested, but of course its legal existence was as complete as though a special bank account had been established for the deposit of the reserve, or other steps had been taken to segregate it.

This is a convenient place to note that by the agreement of counsel the balance in the capital account as to which the plaintiff demands an accounting, is most recently agreed to be the sum of $38,621.49.

One reason for the formation of the partnership was to lend credence to the theory that the receivables of the corporation being distributed by the partnership, were by that process transmuted from income into capital, and therefore taxable as for capital gains.

As might have been anticipated, that theory did not command acceptance by the Commissioner of Internal Revenue; in 1943 a redetermination of the corporate and individual income tax liabilities was made, with the result that a sum in excess of $900,000 was assessed against the corporation. That development is the main explanation of the present controversy, because the position of the Government involved not only a deficiency in the corporate income taxes, but asserted transferee liability on the part of these two stockholders; the asserted increased liability of the latter with reference to their personal income taxes was of course a separate thing, and so far as Whitehouse was concerned, it is not argued that any duty arose on the part of Pine with respect thereto.

The partnership agreement provided for the payment of reasonable expenses and outlays in connection with the conduct of its affairs, including a $20,000 annual salary to Pine, payable monthly; then, the establishment of the reserve fund above referred to, and thereafter the distribution of capital to the partners.

The testimony is that Whitehouse received his first $100,000 in December of 1942, and so did Pine; a second distribution occurred soon thereafter (probably early in 1943) to Whitehouse of a second $100,000, and a like sum to Pine (less an unexplained deduction of some $1,200) but his testimony is that he left his share in the business.

Another claim made by the Government was under the renegotiation clause of one or more of the contracts under

which the corporation had done business with various departments of the Government.

That claim seems to have been advanced in 1945 and without discussing the testimony in detail, I am convinced that Whitehouse was apprized of both the asserted tax liabilities and the renegotiation claim, prior to his death; that he was in communication with the defendant Pine in connection with those matters; further that he specifically agreed that as to the sum of $7,500 paid to an accounting firm in connection with tax matters, a deduction therefor was proper from the reserve account. It does not follow, however, that Pine was given a free rein to expend Whitehouse's half of the remaining portion of the reserve fund, entirely at his own discretion.

Pine's status as contemplated by the partnership agreement, was clearly of a fiduciary nature with respect to the Whitehouse share of the distribution through the functioning of the partnership; Pine thus was a liquidating partner in a firm which itself was a liquidating medium of the corporation. This means that it is proper to exact from him a clear and coherent statement of the items which he disbursed from the reserve fund, in order that a conscionable portion of the total sum may be found to be justly chargeable to the account of the deceased Whitehouse.

In general the defense to the action is that all disbursements which he has made are properly deductible, and therefore half of the total should be charged against the plaintiff.

In the effort to simplify the issues presented in this action, a stipulation of record was entered into as follows:

"It is stipulated and agreed by the attorneys for the respective parties that the following amounts have been paid to the following persons; that these amounts constitute the fair and reasonable value of the services rendered by these persons; that these amounts were paid for services rendered in the tax and renegotiation matters arising from and through the dissolution of Whitehouse & Pine, Inc. as follows:

N. R. Caine & Co., accountant $17,500.
* * * But as to this payment it is further stipulated that if this amount is in error, a further stipulation correcting the same will be filed with this Court.

| | |
|---|---|
| Lawrence Baker, attorney | 6,732.30 |
| Robert Riffkin, accountant | 354. |
| Raymond Wise, attorney | 100. |
| Martin Rosen, accountant | 7,500. |
| Kaye, Scholer, Fierman & Hays, attorneys | 6,299.41 |
| Lehrich & Lehrich, attorneys | 1,013.79 |
| Dammann, Roche & Goldberg, attorneys | 570.75 |
| Maggin & Swan, attorneys | 1,020.50." |

---

(Two items heretofore testified to in answer to interrogatories were withdrawn.)

It is the understanding of the court that the plaintiff, by agreeing that the foregoing amounts have been paid, does not also agree that one-half of the total of these figures is properly chargeable to the plaintiff. The correct charge would emerge from a consideration of all relevant matters.

There are two additional items of disbursements claimed by the defendant, to which the plaintiff objects, and as to them it seems to the court that they

have not been adequately demonstrated in the proof, namely,

A claim on behalf of the defendant for compensation at the rate of $1,500 a year, beginning with May 31, 1944 when the partnership terminated.

As to that, it should be said that while the defendant is held to have assumed a fiduciary obligation for the administration of the fund, it does not follow that he is permitted to fix his own compensation. In the case of an executor or testamentary trustee, the rates are established by law, and are allowed only upon the settlement of a final account.

While that rule is perhaps not strictly applicable to these circumstances, it is true at least in the opinion of this court, that the defendant should be able to demonstrate with something approaching precision, the value of the services that he rendered to Whitehouse and later on behalf of the plaintiff, having in mind that he was jointly interested with the deceased Whitehouse in opposing the tax and renegotiation claims, and that his primary concern was his own.

While it may be difficult to draw the line between that which he did in his own personal interest, and that which he states that he did in behalf of the Whitehouse interests, some attempt should be made to establish a figure which in fairness can be charged against the administratrix of Whitehouse, which would not be necessarily as much as one-half of the total.

Another item consists of payments made to Henry F. Pine (brother of Melvin Pine) who is a lawyer, many of which payments seem to be represented by checks drawn upon the account of still another corporation—Melvin Pine & Co., Inc., of which the defendant Pine is the president and directing head. It was into the employ of this company that Mr. Henry Pine entered, sometime in 1946.

It is not intended by this comment to suggest that Henry Pine did not render any professional services to Melvin Pine which were paid for by the latter, in connection with opposing the tax and re-negotiation liabilities asserted against Whitehouse & Pine, Inc. All that the present observation means is that the subject has not been sufficiently laid bare in the trial of this case to justify any legal conclusion which could be expressed in dollars, concerning the fair value of Henry Pine's services, properly to be charged herein.

It has not been overlooked that the plaintiff urges, largely through the testimony of Mr. Robert Sterling (a member of the firm of plaintiff's attorneys) that there was a failure on the part of the defendant Pine to disclose to the attorneys for the estate the existence of the reserve fund, and the disbursements which are urged to be justly chargeable.

The court cannot find that there was any wilful suppression of the truth as to the creation of the reserve fund, because the accountant Swenson identified a report which he made in the nature of an audit of the financial affairs of the limited partnership, a copy of which was delivered to the deceased Whitehouse sometime in June, 1944. That financial statement revealed that the reserve fund of $50,000 had been set up on the partnership books, and it was in connection with that fact that Whitehouse concededly agreed to the initial payment of $7,500 which was made to the accounting firm of which Caine was a member, in connection with the resassessment of Federal income tax.

In view of the foregoing, it is not easy to perceive that the defendant Pine would have had any plausible reason to seek to conceal the initial existence of the reserve fund.

The defendant offers the following legal arguments which require comment:

That the plaintiff really asserts a breach of contract on the part of the defendant, namely a failure to perform the terms of the partnership agreement, and that the six-year statute of limitations is a bar.

This is not deemed to be persuasive for the reason that the reserve fund established a fiduciary duty; even though

created contractually, plaintiff's cause for an accounting is equitable in nature, rather than for a mere breach of contract. This court takes the view that the ten-year statute controls; thus this action is timely, the complaint having been filed on December 22, 1953, or less than eight years after the death of Whitehouse.

It is also urged that in effect there has been an account stated between the parties, in that the Swenson financial report was retained and not repudiated by the deceased Whitehouse.

This court is not required to adjudicate this point, because there is no substantial difference between the parties as to the present amount of the reserve fund.

Plaintiff's brief, filed after trial, contains the following:

" * * * Such payments left a balance in the defendant's hands at Mr. Whitehouse's death of $39,871 remaining from the original $50,000 set aside as the reserve. The plaintiff concedes that the amount should be further reduced by the sum of $1,249.51, which is the amount by which capital distribution to Mr. Whitehouse exceeded that to Mr. Pine (see Defendant's Exhibit A, statement of partners' capital). This leaves a net in the reserve account at Mr. Whitehouse's death of $38,621.49."

Thus there is no occasion to discuss the so-called account stated.

It results that the plaintiff is entitled to an interlocutory decree to provide that the defendant Melvin Pine is required to prepare and file an account within a period to be specified in the interlocutory decree, of the administration by him of the reserve account as to its present constituency of $38,621.49.

In this connection, it is proper to add that perhaps the time and trouble to both parties in the preparation and exploration of such an account may be out of proportion to the practical results which thereby may be accomplished. After all,

it would seem that the plaintiff at best. would be credited with $19,310.75, and that she would be debited with a total sum which might leave the ultimate success of her efforts somewhat costly.

Settle interlocutory decree.